# UNITED STATES DISTRICT COURT
## for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. 5:22-MJ-00051 |
| a silver, Apple iPhone XR, bearing serial number FFWZ1J2MKXKP | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | See attached affidavit |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Anthony Herrera Jacobs, U.S. Postal Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: <u>Riverside, CA</u>

_____
*Judge's signature*

Honorable Magistrate Judge Shashi H. Kewalramani
*Printed name and title*

AUSA: Byron R. Tuyay, (213) 440-3141

## **AFFIDAVIT**

I, Anthony Herrera Jacobs, being duly sworn, declare and state as follows:

## I. **PURPOSES OF AFFIDAVIT**

1. This affidavit is made in support of an application for a warrant to search a digital device, namely, an Apple iPhone XR, bearing serial number FFWZ1J2MKXKP, currently in the custody of United States Postal Inspection Services ("USPIS") and stored under evidence number A01563184 (the "SUBJECT DEVICE"), as described in Attachment A, which is incorporated herein by reference, for evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute, or distribution of, a controlled substance), 843(b) (use of communication facility to commit drug offense), and 846 (conspiracy to possess with intent to distribute, or distribute, a controlled substance) (collectively described as the "Subject Offenses"), as described more fully in Attachment B, which is also incorporated herein by reference.

2. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of the Subject Offenses from the SUBJECT DEVICE.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants arrest warrants, and criminal complaint and does not purport to set forth all of my

knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF POSTAL INSPECTOR JACOBS

4.  I am a United States Postal Inspector employed by the Los Angeles Division of the United States Postal Inspection Service ("USPIS").  I joined USPIS in August 2003.  I have completed a twelve-week Postal Inspector basic training course, which included training in the investigation of narcotics trafficking via the United States Mail.  I also have completed an advanced training course specifically designed for training investigators of narcotics mailers and shippers.  I am currently assigned to the USPIS Los Angeles Division, Narcotics Team and Parcel Task Force, which is responsible for investigating drug trafficking organizations that use parcels to distribute illegal narcotics and/or narcotics proceeds.  As part of my law enforcement duties, I have conducted numerous parcel investigations that have resulted in the arrest of individuals who have received and distributed controlled substances, as well as the seizure of the illegal drugs and proceeds from the sale of those illegal drugs.

## III. STATEMENT OF PROBABLE CAUSE

5.  Based on my conversations with other law enforcement officers and my own knowledge of the investigation, I am aware of the following:

### A.   Postal Inspectors Find over 4 Kilos of Fentanyl

6.  On August 18, 2021, Inspector Marc Kudley obtained a search warrant in Central District of California Case No. 5-21-MJ-00535,

2

signed by the Honorable Shashi H. Kewalramani, for Express Mail Parcel EI041182577US.  Inspectors then executed the warrant and found inside the the parcel 4,207 grams of a substance which field tested positive for Fentanyl.  The parcel was mailed from the Hesperia post office and was addressed to Alejandro Lopez at 2314 Holland Avenue, Apartment 6B, Bronx, New York 10467.

7.  On August 20, 2021, I forwarded the parcel and its contents to U.S. Postal Inspection Service Forensic Laboratory for further analysis.  Ultimately, the forensic laboratory concluded that the substance contained in the parcel was fentanyl weighing approximately 4 kilograms.

### B.    Postal Inspectors Obtain Search Warrants for Sender's Apartment and Digital Devices

8.  In the weeks following USPS's seizure of the package containing four kilograms of fentanyl, I identified the sender as Jose Luis HERNANDEZ ARAUJO through post office surveillance footage, California Department of Motor Vehicles records, and Internet Protocol ("IP") addresses used to track the package online.  Indeed, in a *Mirandized* interview with Postal Inspectors on November 10, 2021, HERNANDEZ ARAUJO admitted that he sent the package on behalf of an individual named "Manuel" and that he believed the package contained samples of "weed."  HERNANDEZ ARAUJO did not consent to the search of his cell phone, though he acknowledged that he used his cell phone to communicate with Manuel about the packages he's mailed on Manuel's behalf.

9.  Based on this information, on November 23, 2021, I obtained search warrants for HERNANDEZ ARAUJO's person and apartment on

3

Hercules Street in Hesperia, including any digital devices that he used or belonged to him.  The warrants were signed by the Honorable Sheri Pym, United States Magistrate Judge (5:21-MJ-00691 and 5:21-MJ-00692).  Attached hereto as Exhibit 1 is a conformed copy of the previous search warrant application and my affidavit supporting the warrant to search HERNANDEZ ARAUJO's person, which is incorporated herein by reference.

10. After I obtained the search warrants, however, I learned that HERNANDEZ ARAUJO moved out of his apartment on Hercules Street in Hesperia, so I was unable to execute those warrants or locate him until his arrest in January 2022.

### C.   Hernandez Aurajo's Indictment and Arrest

11. On January 12, 2022, a federal grand jury in the Central District of California returned an indictment (ED CR 22-00012-JWH) charging HERNANDEZ ARAUJO with one count of possession with intent to distribute at least 400 grams of fentanyl in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi) based on the parcel I investigated and interviewed him about.

12. On January 20, 2022, HERNANDEZ ARAUJO was arrested. Incident to HERNANDEZ ARAUJO' arrest, Postal Inspectors searched his person and found the SUBJECT DEVICE.  The SUBJECT DEVICE is currently in custody at USPIS offices in San Bernardino, stored under evidence number A01563184.

### IV. TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING

13. Based on my training and experience and information obtained from other law enforcement officers who investigate drug trafficking, I know the following:

a.   The distribution of drugs is a continuing criminal activity that occurs over months, and often years.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, including tablets, such as ipads.

b.   Drug traffickers use telephones, portable cellular and digital telephones, pagers, and other communication devices, sometimes in fictitious and/or other individuals' names, and maintain in such devices telephone and other contact information which reflects names, addresses, and/or telephone numbers of their associates in the drug-trafficking organization, as well as customers of their drug trafficking business.

c.   Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and co-conspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and co-conspirators involved in narcotics trafficking.

d.    Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various co-conspirators tend to be ongoing until their arrest.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to confirm that they are in possession of the drugs, boast about the drugs, or facilitate drug sales.  It is also common for drug traffickers to carry cellular telephones in order to remain in contact with drug suppliers or customers, to communicate with co-conspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various co-conspirators, and to coordinate the amount of drugs trafficked, as well as payment amounts and methods.  It is common for drug traffickers to accept orders and payments for drugs prior to drugs being delivered, especially in the case of drugs being shipped using the Postal Service.  Accordingly, there is often a lag between the time drugs are ordered and paid for, and the time they are received by the purchaser.  Based on my training and experience,

I know that the above-described information can be stored on digital devices carried by drug traffickers.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

14.   As used herein, the term "digital device" includes the SUBJECT DEVICE.

15.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    2.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

       a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a

complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

3.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after

a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HERNANDEZ ARAUJO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of HERNANDEZ ARAUJO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

16.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VI. <u>CONCLUSION</u>

17.   For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
January, 2022.


_____
HONORABLE SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

SUBJECT DEVICE TO BE SEARCHED

    The SUBJECT DEVICE is a silver, Apple iPhone XR, bearing serial number FFWZ1J2MKXKP, currently in the custody of United States Postal Inspection Services ("USPIS") and stored under evidence number A01563184.

**ATTACHMENT B**

## I.   **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute, and distribution of, controlled substances), 843(b) (use of communication facility to commit a drug offense), and 846 (conspiracy to possess with intent to distribute, or distribute, a controlled substance) (collectively described as the "Subject Offenses"), namely:

a.    Data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

b.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

c.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls concerning controlled substances and/or money, assets or payments for said substances for the period beginning July 1, 2021 and ending on the day the search warrant is executed;

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices concerning controlled substances and/or money, assets or payments for said substances for the period beginning July 1, 2021 and ending on the day the search warrant is executed;

e.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device concerning controlled substances and/or money, assets or payments for said substances for the period beginning July 1, 2021 and ending on the day the search warrant is executed;

f.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

g.   Contents of any calendar or date book;

h.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

iii

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.     records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; and cellular phones, specifically, including the SUBJECT DEVICE.

II. <u>**SEARCH PROCEDURE FOR DIGITAL DEVICE**</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

iv

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device on-site or seize and transport the device and/or forensic images thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital devices and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

v

Kit), which tools may use hashing and other sophisticated techniques.

c. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

  5.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

      a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

      b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

      d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

      e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

      f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

      g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

     6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

     7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress HERNANDEZ ARAUJO's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of HERNANDEZ ARAUJO's face with his or her eyes voluntarily open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.